UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CORECIVIC OF TENNESSEE, LLC, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )    No. 3:25-cv-00514 |
| | ) |
| UNIVERSAL STRATEGIC ADVISORS, LLC, | ) |
| | ) |
|     Defendant. | ) |

**MEMORANDUM OPINION**

CoreCivic of Tennessee, LLC ("CoreCivic") brings state law claims alleging that Universal Strategic Advisors, LLC ("US Advisors") breached their consulting agreement, tortiously interfered with business relations, and breach of fiduciary duty. (Doc. No. 11 at 1, 10–12). Before the Court is US Advisors' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (Doc. No. 16), which has been fully briefed and is ripe for review. (See Doc. Nos. 17, 18). For the following reasons, the Court will grant the motion in part.

**I.    BACKGROUND AND FACTUAL ALLEGATIONS**[1]

CoreCivic operates and owns detention centers, jails, prisons, and reentry facilities pursuant to contracts with government partners. (Doc. No. 11 ¶ 7). One of CoreCivic's longstanding federal government partners is United States Immigration and Customs Enforcement ("ICE"). (Id. ¶¶ 8, 11). In 2020, when there was an influx of undocumented immigrants into the United States, CoreCivic recognized a business opportunity to assist ICE with managing its "non-

---

[1] The Court relies upon the factual allegations in the Complaint, assumes the truth of those allegations, and construes them and reasonable inferences from them in the plaintiff's favor for purposes of ruling on the motion to dismiss. See, e.g., Erickson v. Pardus, 551 U.S. 89, 94 (2007).

detained docket." (Id. ¶ 9). This would entail providing ICE with administrative services, including conducting background checks and interviews, processing document requests and data entry, answering phone inquiries, and scheduling appointments. (Id. ¶ 10).

Tim Robbins is the Chief Executive Officer of US Advisors, a consulting firm. (Id. ¶ 13). Robbins spent many years working for ICE before joining US Advisors, including as the Acting Executive Associate Director for Enforcement and Removal Operations ("ERO"), which manages ICE's non-detained docket. (Id.). CoreCivic's Vice President of Federal Regulations, Bart Verhulst, has known Robbins for a long time. (Id. ¶ 14). "Because of Robbins' experience, connections, and influence at ICE," Verhulst decided to seek Robbins' help "in expanding CoreCivic's relationships with ICE and other federal agencies." (Id.). This led to CoreCivic entering into a Consulting Agreement ("Agreement") with US Advisors on November 1, 2020. (Id. ¶¶ 12, 13). Under the Agreement, CoreCivic retained US Advisors as a consultant "to provide CoreCivic certain expertise and perform certain services as an independent contractor." (Doc. No. 11 ¶ 15; Doc. No 11-1 at 1).[2] The Agreement further states, in relevant part:

> The Consultant [US Advisors] will be responsible for providing subject matter/ domain expertise and advisory services in support of business development. Specifically, US Advisors will provide these Services to CoreCivic with the primary intent of obtaining and maintaining detention contracts with local, state and federal government entities. US Advisors will collaborate with CoreCivic to identify, shape, penetrate and win business within, but no [*sic*] exclusive to, The Department of Homeland Security (DHS) market. Upon express written mutual agreement, US Advisors will operate as a teaming partner and/or engage in joint venture opportunities. These opportunities may include, but are not limited to Transportation services, Alternatives to Detention (ATD), Halfway Houses, Processing Centers, and Foreign or outside of the contiguous United States (OCONUS) opportunities and other opportunities yet to be determined.

---

[2] The Court may consider the Agreement, which was attached to the Complaint and is referenced in the parties' briefing on the motion to dismiss, "without [] converting [the] motion to dismiss into a motion for summary judgment." Watermark Senior Living Ret. Communities, Inc. v. Morrison Mgmt. Specialists, Inc., 905 F.3d 421, 426 (6th Cir. 2018).

2

(Doc. No 11-1 at 8).

Regarding confidentiality and conflicts of interest, the Agreement provides:

### 5. INDEPENDENT CONTRACTOR STATUS

The Consultant is, and will remain, an independent contractor performing professional services for CoreCivic. . . . Consultant is free to engage in any other work, employment, independent contractor services, consulting services, or jobs of Consultant's own choosing, so long as such services do not violate the confidentiality, conflicts of interest or other competition restrictions set forth in this Agreement.

Consultant and CoreCivic acknowledge and agree to the following rights and duties consistent with an independent contractor relationship: (1) Consultant retains the right to perform services for others during the term of this Agreement pursuant to Section 7. Conflicts of Interest . . . .

This Agreement does not constitute an employment Agreement. . . .

### 7. CONFLICTS OF INTEREST

 . . . . For purposes of this Agreement, a conflict of interest means any circumstance where the interests of Consultant, its principals, employees or agents are in conflict with or adverse to CoreCivic, including, without limitation, where Consultant's service to another client or employer could reasonably be expected to result in a conflict or the appearance of a conflict of interest for CoreCivic or could reasonably be expected to result in a significant adverse impact on CoreCivic (for example, adverse media attention) due to CoreCivic's association with Consultant.

### 8. CONFIDENTIAL INFORMATION PROTECTIONS

All confidential or proprietary information, including but not limited to, any programs, plans or designs whether in hard copy or electronic format developed by, at the direction of, or with the assistance and/or collaboration of Consultant during [its] consulting work for CoreCivic, contract terms, financial information, operating data, staffing patterns, wage levels, quality assurance audit materials and techniques, customer lists, supplier lists, pricing policies, marketing plans, business plans or models, marketing or lobbying information and all other information (the "Confidential & Proprietary Information"), and all other tangible or intangible items or ideas making up the Confidential & Proprietary Information owned or developed by or related to CoreCivic, and the goodwill associated with them, which is not generally available to the public, shall remain the sole and exclusive property of CoreCivic.

(Id. at 2, 3–4).

CoreCivic paid US Advisors $30,000 per month under the Agreement, totaling $1,560,000. (Doc. No 11 ¶ 18). After the parties executed the Agreement, US Advisors and Robbins were "made privy to and brought into CoreCivic's strategies, ideas, and plans to identify, shape, penetrate, and win business from ICE with respect to the non-detained docket." (Id. ¶ 19). Robbins "had access to CoreCivic's confidential and proprietary information" and convened regularly with both CoreCivic and ICE to discuss the non-detained docket. (Id. ¶ 20). With significant input and help from Robbins, CoreCivic made a proposal to ICE in 2023 regarding management of the non-detained docket. (Id. ¶ 21). CoreCivic subsequently twice revised and resubmitted the proposal to ICE, again in consultation with US Advisors and Robbins. (Id. ¶ 22).

On February 9, 2025, after hearing that ICE was interested in CoreCivic's proposal, US Advisors sent CoreCivic a letter "out of the blue," terminating the Agreement effective March 11, 2025. (Id. ¶ 24). CoreCivic then learned that US Advisors and Robbins had made their own proposal to ICE for the same non-detained docket case management services as CoreCivic had, while US Advisors was still consulting and being paid by CoreCivic. (Id. ¶ 25). ICE accepted US Advisors' proposal on March 13, 2025, awarding US Advisors a $73 million contract. (Id. ¶ 26).

No specific type of contractual qualification was necessary to contract with ICE on the non-detention services. (Id. ¶ 30). As such, CoreCivic did not have a General Services Administration Federal Supply Schedule ("GSA FSS") contract, but that did not prohibit ICE from awarding it the non-detention contract. (Id. ¶ 28). As a result of US Advisors' actions, CoreCivic alleges damages, including, but not limited to, lost profits on the non-detention contract, lost future business with ICE on its non-detained docket, and money paid by CoreCivic to US Advisors under the Agreement. (Id. ¶¶ 40, 45, 49).

## II. LEGAL STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Cooperrider v. Woods, 127 F.4th 1019, 1027 (6th Cir. 2025) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). When assessing a Rule 12(b)(6) motion to dismiss, the Court must accept the complaint's well-pleaded factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018) (internal citations omitted). "While the complaint 'does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions'" or "'a formulaic recitation of a cause of action's elements[.]'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020) (quoting Twombly, 550 U.S. at 555). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (internal citation omitted).

## III. ANALYSIS

As an initial matter, the Court has diversity jurisdiction under 28 U.S.C. § 1332(a) and therefore must apply "the choice-of-law rules of the state where it sits," Tennessee. Andujar v. Hub Grp. Trucking, Inc., 161 F.4th 1014, 1017 (6th Cir. 2025). Neither party makes any arguments about choice of law rules and they each apply Tennessee law to CoreCivic's claims. The Court agrees that Tennessee law governs CoreCivic's claims. First, as to CoreCivic's breach of contract claim, Tennessee choice-of-law rules dictate that the Court must "follow the law dictated by the choice-of-law provision in the parties' agreement if that provision is enforceable." Id. Here, the parties' Agreement includes a choice-of-law provision stating that Tennessee law will apply to contract disputes. (Doc. No. 11-1 ¶ 13). Second, as to CoreCivic's tortious interference with

5

business relations and breach of fiduciary duty claims, Tennessee's choice of law rules dictate that tort claims are governed by "the law of the state where the injury occurred . . . unless some other state has a more significant relationship to the litigation." Montgomery v. Wyeth, 580 F.3d 455, 459 (6th Cir. 2009). CoreCivic has its principal place of business in Tennessee, (Doc. No. 11 ¶ 1), and thus the alleged injuries occurred in Tennessee.

CoreCivic sufficiently pleads claims for breach of contract and tortious interference with business relations. However, CoreCivic does not state a claim for breach of fiduciary duty, so that claim must be dismissed.

    1. Breach of Contract

To state a claim for breach of contract under Tennessee law, a plaintiff must show "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract." BancorpSouth Bank, Inc. v. Hatchel, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006) (citations and quotation marks omitted). The parties do not dispute that an enforceable contract exists and thus the first element is satisfied. Instead, US Advisors argues that CoreCivic's breach of contract claim should be dismissed because CoreCivic does not satisfy the second and third prongs—nonperformance amounting to breach and damages. (Doc. No. 16-8 at 9–18). CoreCivic disagrees. (Doc. No. 17 at 3–14).

    a. Element Two: Nonperformance Amounting to Breach

In assessing whether CoreCivic sufficiently alleges that US Advisors breached the Agreement, the Court must look to the language of the Agreement to ascertain the parties' intent. In Tennessee, "[t]he central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." A & P Excavating & Materials, LLC v. Geiger, 622 S.W.3d 237, 247 (Tenn. Ct. App. 2020) (citations and quotation marks omitted). "The parties' intent is presumed to be that specifically expressed in the body of the contract." Id.

6

(citation and quotation marks omitted). "In other words, the object to be attained in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used and to give effect to such intent if it does not conflict with any rule of law, good morals, or public policy." Id. at 247–48 (citation and quotation marks omitted). "If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes." Planters Gin Co. v. Fed. Compress & Warehouse Co., 78 S.W.3d 885, 890 (Tenn. 2002).

US Advisors argues that the Agreement only applies to detention contracts, not contracts for non-detention work like the contract ICE ultimately awarded to US Advisors. (Doc. No. 16-8 at 9–13). The unambiguous language of the Agreement plausibly demonstrates, however, that the Agreement's primary purpose was detention work, but not its sole purpose. (Doc. No. 11-1 at 8). The Agreement states that US Advisors' services will be provided to CoreCivic "with the primary intent of obtaining and maintaining detention contracts." (Id.) (emphasis added). If the parties had intended for the sole purpose to be detention work, they could have written the contract to reflect that, but they did not.

US Advisors also relies on Exhibit 1 to the Agreement to bolster its argument that the Agreement only applies to detention work. The first paragraph of Exhibit 1 states, in part:

> Upon express written mutual agreement, US Advisors will operate as a teaming partner and/or engage in joint venture opportunities. These opportunities may include, but are not limited to Transportation services, Alternatives to Detention (ATD), Halfway Houses, Processing Centers, and Foreign or outside of the contiguous United States (OCONUS) opportunities and other opportunities yet to be determined.

(Doc. No. 11-1 at 8). US Advisors claims that this is "the only language in the Consultant Agreement that could even arguably be related to obtaining non-detained docket work[.]" (Doc. No. 16-8 at 11). Relying on the first paragraph of Exhibit 1, US Advisors reasons that dismissal of CoreCivic's breach of contract claim is required because the parties never executed "another

7

separate express written mutual agreement" covering the other opportunities listed therein. (Id.). However, this provision about potential other business opportunities is specifically qualified or cabined to opportunities when the parties "operate as [] teaming partner[s] and/or engage in joint venture opportunities." (Doc. No. 11-1 at 8). There was no such arrangement here to trigger the written agreement requirement. Indeed, this is directly, opposite of CoreCivic's breach of contract claim that US Advisors essentially went rogue by using its relationships on non-detention opportunities to obtain the $73 million contract for itself. Therefore, US Advisors' argument that the Agreement does not apply to non-detention contracts fails.

Next, US Advisors argues that the Agreement does not contain a noncompete clause, so CoreCivic cannot now complain about US Advisors' actions. (Doc. No. 16-8 at 9–10, 12; Doc. No. 18 at 2). That argument also fails. The Agreement contains clear language prohibiting US Advisors from engaging in conflicts of interest. (See Doc. No. 11-1 at 2). In paragraph 7 of Agreement, the parties define conflicts of interest:

> a conflict of interest means any circumstance where the interests of Consultant, its principals, employees or agents are in conflict with or adverse to CoreCivic, including, without limitation, where Consultant's service to another client or employer could reasonably be expected to result in a conflict or the appearance of a conflict of interest for CoreCivic . . . .

(Id. at 3). The Agreement also contains pristine language prohibiting US Advisors from using CoreCivic's confidential information when engaging in other work. (Id. at 2). CoreCivic alleges that US Advisors sought a contract with ICE for the very same services US Advisors had been engaged to help CoreCivic obtain an ICE contract. (Doc. No. 11 ¶¶ 25, 32, 39). Certainly, that is a plain, simple and plausible allegation that US Advisors used its relationship and information gained in that relationship for itself. This supports CoreCivic's allegation that US Advisors used

CoreCivic's proprietary and confidential information in seeking the ICE contract. (Doc. No. 11 ¶ 39). CoreCivic sufficiently states a breach of contract claim.

      b. Element Three: Damages

US Advisors argues that CoreCivic cannot state a claim for damages because CoreCivic was ineligible to obtain the non-detention contract with ICE and, in any case, the non-detention contract that ICE awarded US Advisors was ultimately canceled. (Doc. No. 16-8 at 14). CoreCivic counters that US Advisors is wrong about CoreCivic's eligibility for the non-detention contract and its plausible damages. (Doc. No. 17 at 3).

According to US Advisors, it was ultimately awarded the non-detention contract in the form of Task Order Number 70CDCR25FR0000032, which was issued pursuant to its GSA FSS contract. (Doc. No. 16-8 at 14). US Advisors explains that "[a] GSA FSS contract is a master contract under which government agencies can award task orders or blanket purchase agreements to the holders of a GSA schedule contract." (Id. at 15) (citing 48 C.F.R. 8.4, *et. seq.*). US Advisors further argues that "[w]hen a government agency solicits services off a GSA FSS contract, all goods or services quoted must be on a vendor's schedule contract as a precondition of it receiving a task order." (Id.) (collecting cases). Therefore, according to US Advisors, because it was awarded the non-detention contract pursuant to its GSA FSS contract, and CoreCivic does not have a GSA FSS contract, CoreCivic was ineligible to receive the non-detention contract. (Doc. No. 16-8 at 14–17).[3]

---

[3] In making this argument, US Advisors references many public records attached to its motion to dismiss. (Doc. No. 16 at 3; Doc. Nos. 16-1 through 16-5). The Court can take judicial notice of public records in ruling on a motion to dismiss. See New England Health Care Emps. Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003), holding modified on other grounds by Merck & Co. v. Reynolds, 559 U.S. 633 (2010) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice.").

9

US Advisors' argument misses the mark. CoreCivic does not argue that it was eligible to receive Task Order Number 70CDCR25FR0000032 specifically. Instead, CoreCivic alleges that it was eligible to obtain a non-detention contract with ICE more generally, even though it did not have a GSA FSS contract. (Doc. No. 11 ¶¶ 28–32; Doc. No. 17 at 4–5). CoreCivic claims that US Advisors actively helped it develop and present a proposal to ICE to obtain a non-detention contract, and that ICE regularly contracts with vendors who do not have GSA FSS contracts, including CoreCivic. (Doc. No. 11 ¶¶ 19–22, 28–32). Thus, according to CoreCivic, just because ICE ultimately chose the GSA FSS contract as the "vehicle or mechanism" through which to award the non-detention contract to US Advisors, that does not mean that a GSA FSS contract was required to obtain any non-detention contact. (Doc. No. 11 ¶¶ 28–32; Doc. No. 17 at 4). The Court must accept these allegations as true at the motion to dismiss stage.

The public records do not change the Court's analysis. Those documents show the issuance of Task Order Number 70CDCR25FR0000032; that US Advisors has a GSA FSS contract; that CoreCivic does not have a GSA FSS contract (which CoreCivic does not dispute); and that Task Order Number 70CDCR25FR0000032 was suspended before ultimately being canceled. (Doc. No. 16 at 3; Doc. Nos. 16-1 through 16-5). None of those documents foreclose CoreCivic's allegation that it submitted an <u>unsolicited</u> proposal and was eligible to perform the non-detention contract. (Doc. No. 11 ¶ 30). Therefore, US Advisors' arguments that a GSA FSS contract is a precondition to a vendor receiving a <u>solicited</u> government contract are irrelevant. (See Doc. No. 16-8 at 15–17). CoreCivic plausibly alleges that it was eligible for a non-detention ICE contract.

US Advisors' next argument, that CoreCivic also cannot establish damages because Task Order Number 70CDCR25FR0000032 was ultimately canceled, is similarly unavailing. Again, CoreCivic does not allege that it was entitled to be awarded Task Order Number

10

Case 3:25-cv-00514   Document 33   Filed 02/27/26   Page 10 of 16 PageID #: 338

70CDCR25FR0000032, specifically.   The cancelation of Task Order Number 70CDCR25FR0000032 does not necessarily bear on the issue of lost profits that CoreCivic claims.  In addition, CoreCivic alleges that it incurred damages not only from losing out on a non-detention contract with ICE, but also other damages, including lost future non-detention business with ICE and money paid to US Advisors under the Agreement. (Doc. No. 11 ¶¶ 40, 45, 49).  As to payments by CoreCivic to US Advisors, US Advisors again argues that the Agreement only covered detention-related work, and because the alleged breach relates to non-detention work, CoreCivic cannot claim damages for those payments.  (Doc. No. 16-8 at 18).  For the reasons stated above, the argument that the Agreement only applied to detention-related work (as opposed to non-detention work) is unavailing.  Therefore, at the motion to dismiss stage, CoreCivic has sufficiently alleged plausible damages and its breach of contract claim will not be dismissed.

  2. <u>Tortious Interference with Business Relations</u>

  In Tennessee, the elements of a claim for tortious interference with business relations are:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

<u>Trau-Med of Am., Inc. v. Allstate Ins. Co.</u>, 71 S.W.3d 691, 701 (Tenn. 2002) (citations and footnotes omitted).  US Advisors argues that CoreCivic's claim should be dismissed because CoreCivic has not sufficiently pled the first, fourth, and fifth elements.  (Doc. No. 16-8 at 18).  Again, US Advisors is wrong.

  The tortious interference with business relations claim will not be dismissed.  CoreCivic pleads facts sufficient to plausibly show that it had a prospective business relationship with ICE.  This is apparent from CoreCivic's allegations that it had made multiple proposals to ICE about

obtaining a non-detention contract. (Doc. No. 11 ¶ 21–22). CoreCivic further alleges that ICE was interested in awarding a non-detention contract to CoreCivic. (Id. ¶ 23). US Advisors again relies on the argument that CoreCivic was ineligible for Task Order Number 70CDCR25FR0000032, and thus did not have an existing or prospective relationship with ICE related specifically to that task order. (Doc. No. 16-8 at 19). To reiterate, that is too narrow a view of the Complaint, and for the same reasons already stated, US Advisors has not shown that CoreCivic was ineligible for the award of a non-detention contract. CoreCivic sufficiently pleads the first element, that it had a prospective business relationship with ICE.

Next, CoreCivic also sufficiently alleges US Advisors' improper motive or means. "It is important to note that *either* 'improper motive' or 'improper means' will suffice." Watson's Carpet & Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007). "[W]ith regard to improper motive, [Tennessee courts] require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff." Trau-Med of Am., Inc., 71 S.W.3d at 701 n.5. Improper means of interfering with a prospective business relationship include, but are not limited to:

> those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition. (emphasis added).

Trau-Med of Am., Inc., 71 S.W.3d at 701 n.5 (internal citations omitted). CoreCivic alleges improper means of interfering with business relations, which is all that is required to satisfy the fourth element of tortious interference with business relations. McCormick, 247 S.W.3d at 176. US Advisors correctly notes that the tort of intentional interference with a business relationship

"should not be interpreted in such a way as to prohibit or undermine the ability to contract freely and engage in competition." (Doc. No. 16-8 at 20) (quoting McCormick, 247 S.W.3d at 178). Nevertheless, CoreCivic alleges that in submitting its proposal to ICE, US Advisors violated the Agreement's prohibitions on using CoreCivic's confidential and proprietary information. (Doc. No. 11 ¶ 39). That is precisely the type of improper means that Tennessee courts have explained suffice for the tort of interference with business relations. Trau-Med of Am., Inc., 71 S.W.3d at 701 n.5. Therefore, CoreCivic has sufficiently alleged that US Advisors used improper means to interfere with its business relations with ICE.

Finally, for similar reasons explained above regarding the breach of contract claim, CoreCivic has adequately pled that the alleged interference caused it harm and damages. The Court notes that US Advisors may be correct that CoreCivic cannot show that its payments to US Advisors under the Agreement "resulted from" the alleged tortious interference. Trau-Med of Am., Inc, 71 at 701; (Doc. No. 16-8 at 22). Nevertheless, CoreCivic claims that due to US Advisors' interference with the non-detention ICE contract, it also suffered damages in the form of lost profits and future business. (Doc. No. 11 ¶ 45). Therefore, CoreCivic sufficiently alleges at least some damages resulted from the tortious interference. CoreCivic's claim for tortious interference with business relations will not be dismissed.

### 3. Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty under Tennessee law, a plaintiff "must prove (1) the existence of a fiduciary duty (2) that was breached (3) proximately causing damages." Pagliara v. Johnston Barton Proctor & Rose, LLP, 708 F.3d 813, 818 (6th Cir. 2013) (citing Morrison v. Allen, 338 S.W.3d 417, 438 (Tenn. 2011)). US Advisors argues that CoreCivic's claim for breach of fiduciary duty should be dismissed because CoreCivic has not plausibly alleged

a fiduciary relationship between the parties and has insufficiently alleged damages resulting from a breach of fiduciary duty. (Doc. No. 16-8 at 23). CoreCivic disagrees, claiming that US Advisors owed it a fiduciary duty under the terms of the Agreement and the implicit understanding between the parties. (Doc. No. 17 at 17.).

CoreCivic has not alleged facts sufficient to demonstrate a fiduciary relationship. Under Tennessee law,

> [f]iduciary relationships are confidential per se because of the legal status of the parties. They automatically give rise to a presumption of undue influence with regard to transactions that benefit the fiduciary. Examples of such fiduciary relationships include that between guardian and ward, attorney and client, or conservator and incompetent. Relationships not fiduciary in nature, even those that are inherently confidential, such as those between family members, are not confidential per se and require proof of the elements of dominion and control in order to establish the existence of a confidential relationship.

Kelley v. Johns, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002) (citations omitted). CoreCivic does not allege that it had the type of relationship with US Advisors that automatically gives rise to a presumption of undue influence. Id. CoreCivic also does not allege anywhere in the Complaint that US Advisors exercised dominion or control over it. Id.

The cases CoreCivic cites in support of its claim that the parties had a fiduciary relationship are unhelpful. First, CoreCivic cites Pagliara v. Johnston Barton Proctor & Rose, LLP, 708 F.3d 813 (6th Cir. 2013), for the proposition that "in Tennessee, a fiduciary relationship 'may arise between two parties in any number of circumstances, both formal and informal. . . . In the most general sense, a fiduciary duty is the duty to act with due regard for the interests of another. This means a fiduciary 'is bound to exercise good faith and due diligence' in its dealings.'" (Doc. No. 17 at 17, 18 n.9) (quoting Pagliara, 708 F.3d at 818). Conveniently, CoreCivic omits the portion of this quote from Pagliara that mentions dominion and influence: "a fiduciary relationship may arise between two parties in any number of circumstances, both formal and informal, *including*

14

'*whenever confidence is reposed by one party in another who exercises dominion and influence*.'" Pagliara, 708 F.3d at 818. Further, the court in Pagliara did "not consider whether a fiduciary relationship actually existed between the parties." Id. at 819. Thus, Pagliara does not control the analysis here.

Similarly, CoreCivic quotes one sentence from Klein v. May, No. 86-184-II, 1986 WL 12177, at *3 (Tenn. Ct. App. Oct. 31, 1986): "The most common relationships giving rise to a finding of a confidential relationship or one of trust and confidence are trustee and beneficiary, attorney and client, parent and child, guardian and ward, physician and patient, nurse and invalid, or confidential friend and advisor." CoreCivic again omits crucial context from that quote: "The critical feature of a confidential relationship or one of trust and confidence is a 'dominion or influence' of one party over the other as a result of their special relationship." Klein, 986 WL 12177, at *3 (citing Turner v. Leathers, 191 Tenn. 292, 232 S.W.2d 269 (1950)). Again, CoreCivic does not allege that there was any element of dominion or influence in its relationship with US Advisors.

Next, CoreCivic cites two cases that apply law that is irrelevant here: DSG Corp. v. Anderson, 754 F.2d 678 (6th Cir. 1985), applying Kentucky law, and In re Bavelis, 490 B.R. 258 (Bankr. S.D. Ohio Mar. 28, 2013), applying Ohio and New York law. As explained, Tennessee law applies in this case. DSG Corp. involved an employer-employee relationship, 754 F.2d at 682, whereas the Agreement here expressly disclaims that it creates an employment relationship. (Doc. No. 11-1 at 3). CoreCivic also cursorily cites U.S. v. Boyd, 363 S.W.2d 193, 200 (Tenn. 1962), but Boyd does not address fiduciary duties or relationships at all.

Lastly, CoreCivic relies on two cases that address relationships of a type not at issue in this case. First, CoreCivic briefly cites Johnson v. John Hancock Funds, 217 S.W.3d 414, 428 (Tenn.

Ct. App. 2006), which involved a stockbroker/financial advisor-client relationship. (Doc. No. 17 at 17, 18 n.9). In that case, the court discussed fiduciary relationships solely and expressly in the context of stockbroker/financial advisor-client relationships. 217 S.W.3d at 428. That type of relationship is not at issue between US Advisors and CoreCivic. Second, CoreCivic cites <u>Stangenberg v. Allied Distrib. and Bldg. Serv. Co.</u>, No. 86-12-II, 1986 WL 7618 (Tenn. Ct. App. July 9, 1986), which involved an officer and director of a corporation. There, the court discussed fiduciary relationships in the specific context of corporate officers and directors and the "doctrine of corporate opportunity," which the court explained was "one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents. . . ." <u>Stangenberg</u>, 1986 WL 7618, at *7 (citation and quotation marks omitted). US Advisors is not an officer or director of CoreCivic, so <u>Stangenberg</u> is inapposite.

CoreCivic fails to satisfy the first element of a breach of fiduciary duty claim, the existence of a fiduciary duty, so that claim must be dismissed. <u>Pagliara</u>, 708 F.3d at 818.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss (Doc. No. 16) is granted in part and denied in part. CoreCivic's claim for breach of fiduciary duty will be dismissed.

An appropriate order will be entered.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE
